J-A09015-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| BRIAN KEITH BARBOUR | : | No. 1346 MDA 2022 |

Appeal from the Order Entered September 14, 2022
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0000055-2022

BEFORE: BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:         **FILED: APRIL 11, 2023**

The Commonwealth of Pennsylvania appeals from the order filed September 14, 2022, which, based upon a finding of some evidence of taint, granted leave for Brian Keith Barbour ("Defendant") to request appointment of an expert to evaluate the juvenile male victim in this case, B.D.J., and prepare a report. The order further provided that upon review of the expert report, the trial court would issue a subsequent order to schedule a competency hearing for the victim. We affirm the order's finding of taint but otherwise vacate the order and remand for proceedings consistent with this memorandum.

Defendant was charged by criminal information with one count each of corruption of minors, indecent assault of a person less than thirteen years of age, and indecent assault of a person less than sixteen years of age, for alleged incidents involving B.D.J., between October 2018 and October 2020.

Defendant filed a pre-trial motion for taint examination and witness competency for B.D.J. Regarding Defendant's allegations of taint, he averred that (1) B.D.J. answered questions in his forensic interviews in a way that indicated that B.D.J.'s mother ("Mother") had advised him that his answers during the interviews would impact her custodial status; (2) B.D.J. did not disclose the allegations against Defendant during the first interview, despite questions designed to elicit such responses; (3) when Mother learned that B.D.J. had not disclosed abuse by Defendant during the course of the first interview, she told police that B.D.J. had not been aware he was supposed to discuss Defendant during that interview and she thereafter requested and was granted a second interview for B.D.J. to discuss the allegations against Defendant; (4) the second interview was conducted one month after the first interview by a different interviewer; and (5) as a result of the two interviews, B.D.J. was subjected to repeated questions that "led him to form expectations regarding the expected answers[.]" Motion for Taint Examination, 4/19/22, at unnumbered 5-9.

On July 18, 2022, the trial court held a hearing on the motion to allow Defendant the opportunity to establish some evidence of taint. After the hearing, the court took the matter under advisement and the parties submitted briefs in support of their respective positions. Besides disagreeing about the purported evidence of taint, the parties also diverged as to the procedure the court should follow if it found some evidence of taint. Defendant sought a psychiatric evaluation of B.D.J. prior to any competency hearing,

whereas the Commonwealth insisted a competency hearing should be held before conducting any evaluation. **Compare** Defendant's Written Argument in Support, 8/17/22, at 12-13 **with** Commonwealth's Brief in Opposition, 8/22/22, at unnumbered 4-5. Ultimately, the trial court found Defendant met his burden of producing some evidence of taint and agreed with Defendant's proposed procedure. Therefore, the court granted leave for Defendant to request appointment of a psychiatric expert to conduct an examination of B.D.J. and author a report for use at a future competency hearing.

The Commonwealth timely filed a notice of appeal.[1] Both the Commonwealth and the trial court have complied with Pa.R.A.P. 1925. The Commonwealth presents the following issues for our review:

---

[1] Since the Commonwealth's notice of appeal did not include certification pursuant to Pa.R.A.P. 311(d), this Court issued an order directing the Commonwealth to show cause as to why the instant appeal should not be quashed as interlocutory and premature. **See** Order, 11/22/22. In response, the Commonwealth clarified that it was appealing pursuant to the collateral order doctrine set forth in Pa.R.A.P. 313. This Court discharged the rule to show cause order and referred the issue to the merits panel.

In considering this issue, we note that the underlying order granted Defendant "leave to submit an appropriate filing requesting appointment of an expert to conduct an evaluation of the witness and prepare an expert report." Order, 9/14/22. While written permissively, the order granted Defendant's request to have an expert appointed to conduct an evaluation of B.D.J. prior to a competency hearing. This Court has held that a "ruling requiring the victim to undergo a psychiatric examination" is subject to review as a collateral order. **Commonwealth v. Alston**, 864 A.2d 539, 563-64 (Pa.Super. 2004) (*en banc*) (finding that (1) such a "ruling clearly is separable from the main cause of action because the propriety of the order may be addressed without analysis of the merits of the underlying criminal action[;]" (2) "important constitutional privacy rights of the child victim are being invoked, the matter impacts cases

*(Footnote Continued Next Page)*

A. Whether the [trial] court erred when it found [Defendant] had [met] his burden of producing some evidence of taint and granted [Defendant's] motion to require a juvenile victim to undergo a psychiatric evaluation?

B. Whether the [trial] court erred when it granted [Defendant's] motion to require a juvenile victim to undergo a psychiatric evaluation without observing or examining the juvenile?

Commonwealth's brief at 4 (capitalization altered).

We begin with the Commonwealth's first issue: whether the trial court erred in finding Defendant had met his burden of establishing some evidence of taint. **See** Commonwealth's brief at 2. Our Supreme Court has held that "[a]n allegation that the witness's memory of the event has been tainted raises a red flag regarding competency," and thus "a competency hearing is the appropriate venue to explore allegations of taint." **Commonwealth v. Delbridge**, 855 A.2d 27, 40 (Pa. 2003) ("**Delbridge I**"). "The determination of a witness's competency rests within the sound discretion of the trial court." **Commonwealth v. Judd**, 897 A.2d 1224, 1228 (Pa.Super. 2006) (citation omitted). We will not disturb a court's competency ruling absent a clear abuse of discretion. **Id**. Given the trial court's discretion, we have observed that "our standard of review of rulings on the competency of witnesses is very limited indeed." **Id**. (cleaned up).

---

beyond the one at issue, and constitutional-based privacy rights are too important to be denied review[;]" and (3) "if the court's order cannot be reviewed before the examination is conducted, the claim will be lost forever"). As in **Alston**, the September 14, 2022 order is subject to review under the collateral order exception and this matter is properly before this Court.

Turning to the trial court's preliminary finding of some evidence of taint, our Supreme Court has set forth the following general legal standard:

> The core belief underlying the theory of taint is that a child's memory is peculiarly susceptible to suggestibility so that when called to testify a child may have difficulty distinguishing fact from fantasy. Taint is the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child, rendering that child incompetent to testify.

*Commonwealth v. Delbridge*, 859 A.2d 1254, 1256 (Pa. 2004) (plurality) ("*Delbridge II*") (cleaned up). In considering whether a defendant has presented some evidence of taint, "we look to the totality of the circumstances surrounding the revelation of the allegations of child sexual abuse." *Delbridge I*, *supra* at 41.

> Some of the factors that are relevant in this analysis are: (1) the age of the child; (2) the existence of a motive hostile to the defendant on the part of the child's primary custodian; (3) the possibility that the child's primary custodian is unusually likely to read abuse into normal interaction; (4) whether the child was subjected to repeated interviews by various adults in positions of authority; (5) whether an interested adult was present during the course of any interviews; and (6) the existence of independent evidence regarding the interview techniques employed.

*Judd*, *supra* at 1229 (citation omitted).

At the hearing, Defendant presented testimony from two forensic interviewers at the York County Children's Advocacy Center ("CAC") and two Pennsylvania State Police ("PSP") troopers involved in the investigation of this case. Additionally, Defendant played a video recording of B.D.J.'s first forensic interview. Based on this evidence, the following was developed.

Mother made the initial report of alleged abuse perpetrated against B.D.J. by two individuals:  B.D.J.'s stepfather and Defendant.[2]  PSP Trooper Eric Randolph Gary Majors, the lead investigator, contacted Mother, arranged for B.D.J. to be interviewed at the CAC, and explained to Mother the interview process.  *See* N.T. Motion Hearing, 7/18/22, at 65-66.  In doing so, he testified that he gave no indication that a separate interview would be conducted for each alleged perpetrator.  *Id*. at 69.

During the first interview, which was conducted by Kristina Taylor Porter on March 26, 2021, B.D.J. disclosed one episode of abuse implicating his stepfather.  *See id*. at 12; Exhibit 1 (Video Recording CAC Interview, 3/26/21).  Ms. Porter, as was custom, asked B.D.J. several questions meant to screen for additional perpetrators.  Specifically, she asked the following:

- Has anything like this happened with anyone else?

- Has anybody else ever made you feel really weird like this?

- Has anybody ever tried to touch your area?[3]

- Has anybody ever touched your area?

- Has anybody ever showed you their area that you didn't want to see?

- Has anything else ever happened to you that we haven't talked about today that made you feel uncomfortable or weird?

---

[2] The relationship between B.D.J. and Defendant is unclear from the certified record.

[3] B.D.J. used the term "area" to refer to his genitals.

- Has anybody ever shown you that part of their body?

- Have you ever seen that part on somebody else's body?

- Has anybody ever made you touch that part on their body?

- Has anybody else ever tried to touch that part on your body?

Exhibit 1 (Video Recording CAC Interview, 3/26/21). B.D.J. answered these questions in the negative and did not disclose abuse from Defendant or any other individuals. *Id*.; *see also, e.g.,* N.T. Motion Hearing, 7/18/22, at 12, 14, 21.

Turning back to the beginning of the interview, Ms. Porter asked then-eleven-year-old B.D.J. questions about the difference between the truth and a lie. *See* Exhibit 1 (Video Recording CAC Interview, 3/26/21). Additionally, in discussing background questions, B.D.J. revealed that his four younger brothers lived in a foster home, while he and his two older sisters lived with Mother. *Id*. When asked who told him about coming in that day and why, B.D.J. stated that Mother told him and she said that "she wanted me home, she didn't want me to get sent away, so she wanted me to talk to y'all." *Id*. Finally, Ms. Porter did not ask any questions regarding potential outside influence during the interview. *Id*. at 22.

PSP Trooper Timothy Reynolds, the local law enforcement officer who attended the first interview, believed at the conclusion of the interview that no additional interviews were necessary. *See id*. at 56. Nonetheless, as noted, Mother later contacted the PSP troopers to request a second interview because she claimed B.D.J. had been unaware he was supposed to discuss the

allegations of abuse against Defendant at the first interview. *Id*. at 57. Ultimately, Clara Roberti conducted a second forensic interview of B.D.J. on April 26, 2021. Ms. Roberti testified that during this second interview B.D.J. disclosed abuse allegedly perpetrated by Defendant.[4] *Id*. at 40-41, 58. She further testified that she did not ask B.D.J. any questions pertaining to potential outside influence during this second interview. *Id*. at 45.

The trial court offered the following explanation in support of its finding that Defendant had met his burden of producing some evidence of taint:

By all accounts, Mother was provided with information as to the process for the interview and was provided no information which should have led her to believe more than one interview would take place. [B.D.J.] told the first interviewer that [Mother] said she didn't want him sent away so he had to talk to someone that day. This evidences some level of preparation or guidance from Mother prior to the first interview. Given the testimony that Mother was informed of the process and Mother discussed the interview with [B.D.J.] ahead of time, it is illogical that [B.D.J.] went in thinking he was to only discuss one perpetrator, as there is no basis for this understanding. Additionally, there was significant testimony as to the open-ended questions asked to the child and numerous opportunities throughout the interview to talk about the Defendant. Although both forensic interviewers testified that a second interview is not held at the request of the party, there is a strong inference that in an indirect way the second interview was held because of Mother's request to Trooper Reynolds. [B.D.J.] came to the second interview fully prepared to talk about

---

[4] At the hearing, Defendant attempted to admit a video recording of the second interview as Exhibit 2, but the Commonwealth objected based on lack of foundation. The trial court granted leave for the parties to reach a post-hearing stipulation as to the admission of Exhibit 2. *See* N.T. Motion Hearing, 7/18/22, at 42-43, 47-48, 77; *see also* Order, 7/21/22. The video recording of the second interview is not contained within the certified record. Upon informal inquiry, we learned that no such stipulation was ever reached and the video recording was consequently not admitted into evidence.

Defendant and was not asked any screening questions which would provide insight as to why he never mentioned Defendant in the first interview but was prepared and able and willing to discuss him in the second interview.

Finally, the reasons Ms. Roberti stated for conducting a second interview; namely, new information received, subject matter that was not explored, or a child that was unable to complete the first interview due to physical or mental health reasons, were not applicable in this matter.

In considering all testimony, we find some evidence of taint exists.

Trial Court Opinion, 11/18/22, at 9-10.

On appeal, the Commonwealth contends that the trial court's inferences are "not supported by the record, and at times disregards the testimony that was provided at the hearing." Commonwealth's brief at 17-18. This proclamation is unsubstantiated, as the Commonwealth fails to cite to specific testimony in its argument that the trial court allegedly misinterpreted or ignored. Moreover, our review of the record reveals the opposite to be true. In fact, we conclude that the record wholly supports the trial court's inferences. Considering the totality of the circumstances surrounding B.D.J.'s allegations of abuse against Defendant and the evidence presented at the motion hearing, we discern no abuse of discretion on the trial court's part in finding that Defendant met his threshold burden of producing some evidence of taint. Accordingly, the Commonwealth is not entitled to relief on this claim.

We now turn to the Commonwealth's second issue on appeal, which addresses the procedure to be followed once the court makes a finding of

some evidence of taint. Specifically, the Commonwealth "avers that the [trial] court erred when it granted [Defendant's] motion to require a juvenile victim to undergo a psychiatric evaluation before observing or examining the juvenile." Commonwealth's brief at 18 (capitalization altered). In support, the Commonwealth relies on this Court's decision in **Commonwealth v. Alston**, 864 A.2d 539 (Pa.Super. 2004) (*en banc*). Defendant, for his part, maintains that the court followed the correct procedure in its order because the court had sufficient opportunity to observe B.D.J. through the evidence presented at the motion hearing. **See** Defendant's brief at 23-24.

On appeal, the trial court agrees with the Commonwealth that it erred, and that once it determined "Defendant met his burden of showing some evidence o[f] taint, the next step is for the court to schedule a competency hearing to further explore this claim." Trial Court Opinion, 11/18/22, at 11. In that vein, the trial court requests that we vacate the portion of the order granting leave for Defendant to file a motion for the appointment of an expert to conduct an evaluation and report prior to a competency hearing, and instead remand for a competency hearing to further explore the claim of taint. **See id**. at 11-12.

In considering this issue, we are guided by this Court's decision in **Alston**. Therein, the Commonwealth appealed, *inter alia*, the court's ruling "that the victim in this sexual assault case must undergo a psychiatric examination to assist in assessing her competency." **Id**. at 542. Based on

the victim's prior, potentially false allegations of sexual abuse against individuals other than Alston, the court found "a searching inquiry into the victim's competency, including a psychiatric evaluation[,]" was warranted. *Id*. The court expressly declined to interview the victim or make a competency determination prior to ordering the psychological evaluation because it believed the evaluation was necessary for it to assess the competency of the victim. *See id*. at 548.

In addressing this issue, this Court observed that when a trial court is tasked with determining the competency of a child, it may base that decision in part on expert testimony:

> While the court may consider such testimony, the question of whether it may order a psychiatric examination against a person's wishes is an entirely distinct inquiry. The privacy implications of a compelled psychiatric examination are significant. Indeed, where the record fails to establish that there is a question as to the victim's competency, we refuse to sanction any intrusion into the victim's existing psychological records or any cross-examination as to psychiatric treatment. *See Commonwealth v. Smith*, 606 A.2d 939 (Pa.Super. 1992).

*Id*. at 549 (citation altered). With this in mind, we found that "[t]he order in question is much more intrusive as it compels a psychiatric examination and not merely permits questioning concerning existing treatment." *Id*.

Next, we observed that a plurality of our Supreme Court, in *Commonwealth v. Garcia*, 387 A.2d 46 (Pa. 1978) (plurality), "concluded that a psychiatric examination of a Commonwealth witness regarding competency may be ordered if a need for the examination is demonstrated." *Alston*, *supra* at 549. However, we found that the record in *Alston* did not

- 11 -

demonstrate need for such an examination because the trial court ordered the psychological examination of the victim without interviewing her, and ordered the examination based solely upon records of prior allegations of abuse. *See id*. In so holding, we reiterated that "[w]hile trial courts regularly make competency determinations, a court-ordered psychological examination should never be the starting point for such a determination." *Id*. As the trial court in *Alston* neither observed nor examined the victim, we concluded that "the order directing the involuntary examination cannot be sustained on the face of the existing record." *Id*. (citation omitted).

Although acknowledging that further inquiry was warranted in the case based on the victim's prior unfounded allegations, this Court in *Alston* found that, "in the absence of some affirmative indication that [the victim did] indeed have a problem distinguishing fantasy from reality, the examination was ordered prematurely." *Id*. at 550. As to the specifics of that further inquiry, this Court relied on *Delbridge I* and *Delbridge II*. We noted that in *Delbridge I*, our Supreme Court "held that when a defendant presents some evidence of taint, that issue should be explored at a competency hearing, and it remanded for such a hearing[.]" *Alston*, *supra* at 550. Regarding *Delbridge II*, the *Alston* Court found our Supreme Court's plurality decision, which was rendered after the competency hearing, to also be insightful:

> At the hearing, the children's testimony established their competency, and the defendant failed to prove the existence of taint either through cross-examination or the testimony of other witnesses. The Commonwealth and the defense presented diametrically opposed expert testimony on whether the victims'

testimony was tainted. Three justices concluded that since the defendant had failed to demonstrate the existence of taint as a predicate matter, the expert testimony was unnecessary. It left open the question of whether expert testimony would be appropriate if the possibility of taint is raised in the record and if the trial court determines that expert testimony would aid it in assessing the impact of the taint on the question of competency.

Applying the rationale of the **Delbridge** decisions to the case under consideration, we conclude the following. [Alston] has presented sufficient evidence to raise a question concerning [the victim's] competency. The prior allegations of abuse, which appear to be false, raise concerns about [the victim's] ability to tell the truth, and a hearing to explore competency certainly is warranted. However, [**Delbridge, II**] reinforces our conclusion that a psychiatric examination was ordered prematurely. If the competency hearing fails to reveal the existence of valid competency concerns, expert testimony would be unnecessary. Hence, we remand for further development of the facts relating to [the victim's] competency.

**Alston**, **supra** at 550–51.

Here, Defendant assails the Commonwealth's reliance on **Alston**, claiming it is factually distinguishable. Defendant argues that, unlike in **Alston**, he established a compelling need for the psychological examination at the motion hearing. Moreover, he contends that the trial court had the opportunity to observe B.D.J. through the two forensic interviews. **See** Defendant's brief at 23. Specifically, he avers that the trial court watched the two forensic interviews, which included the following:

[E]ach interviewer conducted competency questioning with [B.D.J.], discussing the difference between a truth and lie and ensuring he was aware of the difference. The trial court then observed [B.D.J.] promise to tell the truth to all questions asked by both interviewers. However, the trial court observed that he then proceeded to give drastically different answers to the same questions in the two different interviews, claiming to be telling the truth in both.

- 13 -

*Id*. at 24.

Upon review, we deduce that Defendant's contentions are plainly belied by the record.[5]  While it is true that the two interviewers testified to some of the contents of their interviews of B.D.J., Defendant only played the video recording of the first forensic interview at the hearing.  As to the second interview, Defendant initially sought to introduce the video recording of it as Exhibit 2 as follows:  "I just want to enter your video into evidence for the [c]ourt.  I want to see if you can authenticate it for me.  I'm going to pull it up real quickly."  N.T. Motion Hearing, 7/18/22, at 42-43.  Instead of displaying the video, however, counsel for Defendant continued to ask Ms. Roberti questions about the interview.  Defendant did not return to the video during direct examination.  After the Commonwealth conducted its cross-examination, the following exchange occurred:

> [Defendant's Attorney]:  . . . [W]e are having connective issues, but I do have a copy of this CAC interview on April 26th, and I would ask to admit that into evidence.  It was provided to defense by the Commonwealth in the same electronic format.

_____

[5] Indeed, in attacking the Commonwealth's argument, Defendant claims that "[t]he Commonwealth has apparently forgotten that the July 18, 2022 [h]earing, where the trial court observed [B.D.J.] in two separate interviews, has already occurred and that the trial court has already made a threshold competency determination regarding taint."  Defendant's brief at 24. Apparently, Defendant has also forgotten the July 18, 2022 hearing.

| [Commonwealth]: | I think defense still has to lay the foundation, Your Honor, to admit it into evidence. |
| The Court: | There can't be a stipulation? If you have the opportunity to review it, could there be a post-hearing stipulation? |
| [Commonwealth]: | Potentially. |
| The Court: | Let's move toward that. |
| [Defendant's Attorney]: | I can provide the disk to the Commonwealth, if he will review it. Thank you. |

*Id*. at 47-48.

At the conclusion of the hearing, the trial court noted the outstanding need for a stipulation regarding proposed Exhibit 2 and entered an order to that effect. *See id*. at 77; Order, 7/21/22. As noted *supra*, this Court's informal inquiry confirmed that no such stipulation was ever reached and the video recording of the second interview was not admitted as an exhibit. Indeed, there is no indication in the record that the trial court ever viewed the recording of the second interview. *Cf*. N.T. Motion Hearing, 7/18/22, at 15-20 (detailing the admission and playing of Exhibit 1, the video recording of the first forensic interview).

Based on the court's finding of some evidence of taint, further inquiry into B.D.J.'s competency is warranted. However, upon review, we conclude that the court's viewing of a single forty-five-minute forensic interview of B.D.J. is not an adequate substitute for interviewing or observing the child

first-hand. Further, the threshold hearing to determine whether Defendant had established some evidence of taint did not equate to a full competency hearing. As in **Alston**, the trial court here ordered a psychological examination of B.D.J. without first conducting an interview or examining B.D.J. Such action, as conceded by the trial court, was premature. The proper procedure here, as in **Alston**, is for the trial court to first conduct a competency hearing and then, if it deems it necessary, grant Defendant leave to request appointment of an expert to conduct a psychological evaluation of B.D.J. and to prepare a report. **See Alston**, **supra** at 550-51.

Based on the foregoing, we affirm the trial court's finding of some evidence of taint but vacate the remainder of the order granting Defendant leave to request appointment of an expert to evaluate B.D.J. and prepare a report for use at a future competency hearing. Rather, we remand for the trial court to first conduct a competency hearing and determine the necessity of such an evaluation.

Order affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/11/2023

- 16 -